[Cite as *State v. Kingery*, 2012-Ohio-505.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                      :        C.A. CASE NO.    24063

v.                                          :        T.C. NO.    09CRB11732

CHRISTINA KINGERY                           :        (Criminal appeal from
                                       Municipal Court)
    Defendant-Appellant                     :

                                      :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___10th___ day of ___February___, 2012.

. . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101, Chief Prosecutor, City of Dayton, 335 W. Third Street, Room 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

JOHN J. SCACCIA, Atty. Reg. No. 0022217, 536 West Central Avenue, 2nd Floor, Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Christina Kingery was found guilty following a bench trial in the Dayton Municipal Court of menacing and ethnic intimidation. She was sentenced to thirty days in jail for menacing, with all of the jail time suspended, and to sixty days for ethnic

intimidation. She appeals from her conviction. Her sentence was stayed while this appeal was pending.

{¶ 2} In the afternoon of October 8, 2009, Kingery, her husband, and their dog were on the porch of their house at 300 Edgar Street in Dayton when the mail carrier, Laderek Brown, approached. Brown was not the regular carrier on the route. The Kingerys' mailbox was located on the front of the house. As Brown approached the house, the Kingerys' dog ran toward him, barking. The parties dispute whether the Kingerys made any effort to restrain the dog, but Brown sprayed the dog in the face with "dog repellant," which had been provided to him by the postal service.

{¶ 3} The Kingerys were very upset that Brown sprayed their dog. According to Brown and one of the neighbors, Christina Kingery ("Kingery"), who is Caucasian, shouted profanities and racial slurs at Brown, who is African-American, told him to go back to Africa or back to the west side (of Dayton), and threatened to "woop his ass." The neighbor called the police, and Brown decided not to deliver the mail on the rest of the Kingerys' block. Kingery was subsequently charged with menacing and ethnic intimidation.[1]

{¶ 4} At trial, Brown and the Kingerys' neighbor, Maria Wolff, testified for the State; Mr. Kingery testified for the defense. The trial court found Kingery guilty of both offenses and sentenced her as discussed above.

{¶ 5} Kingery raises two assignments of error on appeal, which we will discuss

---

[1] Kingery's husband was also involved in the incident and was charged with menacing and ethnic intimidation. He pled guilty to ethnic intimidation, in exchange for which the charge of menacing was dropped, and was sentenced to a sixty-day suspended jail term. Dayton M.C. No. 09CRB11733.

together.

{¶ 6} I. "THE CONVICTION FOR MENACING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 7} II. "THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION."

{¶ 8} Kingery contends that her convictions were supported by insufficient evidence and were against the manifest weight of the evidence.

{¶ 9} An argument based on the sufficiency of the evidence challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1999). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 10} In contrast, when reviewing a judgment under a manifest-weight standard of review, the court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting

*State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1ˢᵗ Dist. 1983).

{¶ 11} Menacing is defined as "knowingly caus[ing] another to believe that the offender will cause physical harm to the person or property of the other person * * *." R.C. 2903.22(A). Whether a threat sufficient to invoke a charge of menacing has been made is a question of fact to be determined by the trier of fact. *State v. Kerr*, 2d Dist. Montgomery No. 15648, 1996 WL 629515, *3 (Nov. 1, 1996).

{¶ 12} Ethnic intimidation is defined as committing any of the enumerated offenses, including menacing, "by reason of the race, color, religion, or national origin of another person or group of persons." R.C. 2927.12(A).

{¶ 13} At trial, Brown testified that he was confronted by the Kingerys' dog before he reached their porch, and that the dog was "very aggressive" as it came off the porch, was barking, and was not on a leash. Brown had been bitten by dogs previously, and he believed that he was going to be attacked by the Kingerys' dog. He testified that he asked the Kingerys to restrain their dog, but they did not.

{¶ 14} Brown stated that Kingery became very upset and belligerent after he sprayed the dog with repellant. She called him a "n*****," told him to go back to Africa, told him to go back to the west side of the city, and said "that's why I called you a n***** because you do things like that (spraying the dog)."[2] Brown testified that Kingery also threatened "wooping his ass." Brown said that he felt threatened by these comments and by Kingery's screaming and shouting, and that he retreated from the house, believing that Kingery might

---

[2]Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

cause him physical harm. Brown also said that he did not deliver mail to the rest of the Kingerys' block that day.

{¶ 15} Wolff, who lived next door to the Kingerys but did not know them personally, testified that she heard a man and woman yelling loudly at around 2:20 on the afternoon of October 8, 2009, although she was in her house with the doors and windows closed. When she investigated, she saw the Kingerys yelling at the mail carrier; Kingery was on the porch of the Kingerys' house, and her husband was at the fence. According to Wolff, Kingery called Brown a "f***ing n***** on and on and you just need to go back to the west side where you came from and just calling him a f***ing n***** over and over and over." Wolff also heard Kingery say "she would come kick [Brown's] ass but she did not feel like going to f***ing jail that day." Brown did not say anything in response. Kingery's husband was also yelling at Brown. Wolff called her own husband, who was also a mail carrier, to ask what she should do; on his advice, she called the police, but the Kingerys left before the police arrived.

{¶ 16} Kingery's husband, Michael, testified that their yellow Labrador retriever "puppy" was "very small," approximately 20-30 pounds and two feet high. He also testified that Kingery was reaching out to pick up the dog when Brown sprayed the animal. According to Michael, Kingery's only response to Brown was "I can't believe you f***ing did that. What is wrong with you?," then she started to cry, went in the house, and never came back out. He denied hearing his wife call Brown a "n*****." Michael claimed that he was very angry and confronted Brown to demand an explanation. Michael admitted to "harassing" and "menacing" Brown himself, including following him up the street, but

claimed that his wife had not been involved.

{¶ 17} With respect to the menacing charge, Kingery contends that the State failed to prove that Brown actually believed she would harm him. But Brown expressly testified that he believed he was in danger of physical harm from Kingery and felt threatened. Furthermore, Brown backed away from the house, did not verbally engage with the Kingerys, and did not deliver mail to the rest of their block. Based on Brown's statement that he felt threatened and the other testimony about his actions in response to Kingery's behavior, there was sufficient basis for the court to conclude that Brown had believed Kingery would cause him physical harm.

{¶ 18} Kingery also claims that the State failed to present sufficient evidence that she acted knowingly. To act knowingly, one must be "aware that [her] conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). In her brief, Kingery claims that her response to the "macing" of her dog was "emotional, not intentional or knowingly." However, the State's evidence, including Kingery's yelling that she would "woop his ass" while spewing racial epithets in close physical proximity to Brown, if believed, was sufficient to convince the average mind that Kingery knowingly threatened Brown and that Brown believed he was in jeopardy of physical harm. The court could have reasonably concluded that Kingery had knowingly threatened or intimidated Brown.

{¶ 19} Kingery further contends that there was insufficient evidence that "[t]his was * * * an attack * * * perpetrated because the man was African-American " to support her conviction for ethnic intimidation. She again characterizes her outburst as "emotional," but

asserts that it was not related to Brown's race or color.

{¶ 20} Although Kingery used racial slurs in yelling at Brown about his treatment of her dog, the State presented no evidence to suggest that her reaction would have been less vituperative if a non-African-American mail carrier had sprayed the dog (although the particular hate words might have been different). It was Kingery's perceived treatment of her dog, not the race of the mail carrier, that triggered the outburst. Kingery chose to use racial abuse in expressing her anger, but the choice of repugnant or obnoxious language does not, in itself, demonstrate that an action was undertaken "by reason of the victim's race."

{¶ 21} The United States Supreme Court has held that selecting a victim based on race, color, religion, and the like falls outside of the range of conduct that the First Amendment protects. *Wisconsin v. Mitchell*, 508 U.S. 476, 487, 133 S.Ct. 2194, 124 L.Ed.2d 436 (1993).[3] Ethnic intimidation statutes proscribe conduct (rather than speech) that is not protected under the First Amendment. *Dayton v. Smith*, 68 Ohio Misc.2d 20, 646 N.E.2d 917 (Dayton Mun. 1994), citing *Mitchell*; *In re M.J.M.*, 858 A.2d 1259 (Pa.Super. 2004), citing *Mitchell*. Thus, Kingery's words alone could not have established the offense of ethnic intimidation.

{¶ 22} Kingery cites several ethnic intimidation cases which make the point that the racial motivation constituting such an offense goes beyond mere words. *See, e.g., In re McDonald*, 11th Dist. Lake No. 2006-L-027, 2007-Ohio-027 (where a package resembling a bomb was delivered to the only African-American family in a neighborhood, as they were in

---

[3] Also, the Court recently reaffirmed that insulting and even outrageous speech must be tolerated "to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Snyder v. Phelps* (2011), _____ U.S. _____, 131 S.Ct. 1207, 1219, 179 L.Ed.2d 172, citing *Boos v. Barry* (1988), 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333.

the process of moving in, addressed "to the N\*\*\*\*\*\*" and from "your friends the K.K.K."); *State v. Grays*, 12th Dist. Butler No. CA2005-07-187, 2006-Ohio-2246 (where a cross was burned in the yard of an African-American woman). In these cases, the defendant exhibited a racial animus directly tied to and as a motivating factor in the underlying offense. No such evidence was presented against Kingery. There was no basis to conclude that Kingery's reaction to the spraying of her dog would have been more civilized or less "emotional" if the mail carrier had not been African American. Thus, Kingery's conviction for ethnic intimidation was supported by insufficient evidence.

{¶ 23} Kingery's assignments of error are overruled to the extent that they challenge her conviction for menacing. Her assignments are sustained to the extent that they challenge her conviction for ethnic intimidation.

{¶ 24} Kingery's conviction for menacing will be affirmed; her conviction for ethnic intimidation will be vacated.

. . . . . . . . . .

FAIN, J., concurs.

HALL, J., concurring in part and dissenting in part:

{¶ 25} I agree with the majority that the defendant's conviction for menacing was not against the manifest weight of the evidence and I would affirm that conviction.

{¶ 26} I disagree with the majority's conclusion that there was insufficient evidence to support the offense of ethnic intimidation. In my view, the evidence of defendant's vitriolic response, laced with racial slurs and profanity, was sufficient for the trial court to infer that racial animus was the motivating factor in the defendant's threats. I would affirm

the conviction for ethnic intimidation.

. . . . . . . . . .

Copies mailed to:

Stephanie L. Cook
John J. Scaccia
Hon. Daniel G. Gehres